Thank you. Please be seated. So we now have our last case of today's oral arguments. And we'll begin with Ms. Jones. Danielle Jones Good morning, Your Honors. Danielle Jones for the appellant, David Karcher. There are a few things that I want to point out or distinguish that were requested by the court in the letter with some of the last-minute questions. Before I do that, the first thing I want to address is this issue of the burden of proof that the district court applied. I'm not going to go back into why we feel that it was applied erroneously, but I do want to point out the fact that what wasn't discussed is that this burden that's placed on the plaintiff in employment law cases and, of course, in this incident case, it seems to be a fairly heavy burden, a heavier burden than is typically placed on an employer, whether In a summary judgment case, it's up to the movement to prove the absence of a material fact. And I think that gets skipped over a lot, and I think that's what happened in this case, whereas the employer gets to say, hey, here's my proof that there's no material fact just by saying the sentence, there's no material facts. There's no real burden. When the proof of a particular item is on the non-movement, it is okay to point out that the non-movement lacks any evidence or sufficient evidence of any material facts. And then that does shift it in the summary judgment for you to raise a fact issue, not for you to convince anybody, but for you to raise a fact issue. Yes, Your Honor, I agree with that, and we did that in this case. The non-movement can, by depositions or other evidence or other submittals or by affidavit, respond to the summary judgment motion, which is exactly what was done in this case. Without going into detail, we've already distinguished four sites in the briefs, but in this case, we submitted a 13-page affidavit, which take away the intro and conclusions. You're looking at 11 pages. It was 11 very detailed pages of an affidavit of facts by David Karcher to prove genuine issue of material fact. And at that point, I think the burden does shift somewhat to the government. Oh, I mean, if they're, you know, if believing Mr. Karcher would be enough for him to win, then I agree that's enough to raise a fact issue and then you go to a trial. But I will say that I have to be, I have to tell you, I'm a little bit confused by this whole August 4th and then like August 12th or 14th goes from, I'm fine, ready to get back to work to his doctor saying, oh my heck, being back at work has made you really, really nervous, really, really upset. And he said he wasn't allowed back to work. So I don't really understand that. Can you explain that? Yes, Judge. When he returned on August 4th, he returned with a note from his medical provider. Yes, a nurse practitioner who shouldn't be discounted as an MD, but a medical provider that says, hey, he's able to return to work with no restrictions. In response, Mr. Karcher was treated immediately almost with hostility saying, hey, okay, I know you think you can come back to work, but we're not letting you. We want your computer. We want your CAT card. We want your gun. We want your badge. We're not permitting you to return to work. In that, the way he was greeted upon return to work, it then aggravated his mental condition. That between the dates of August 5th and August 14th, he was so upset by his return to work that not only did he experience an aggravation of his mental condition, that he actually had physical symptoms resulting therefrom, which is, which is Explain to me, first of all, was he getting paid for that time? Was normal, what he would normally get paid? During the August 5th to the August 14th timeframe, I believe he was, yes. Okay. Was he doing anything? Because, I mean, he said he was back to work. Now, I understand he came in and they said you'd have to go through and you have to get this test done and you have to do this and that. I get that. But did he actually do anything else? I mean, did he, you know, sit in the library and put up books or something? He was not permitted to, when I say he wasn't permitted to return to work, they would not place him in a light duty position. They didn't say, that's my understanding. He comes in and they say you're going to need to go through this and that first. He gets upset. So, what happens between the 5th and the 14th? He comes in for that day. Walk me through, like, I don't understand why his doctor or nurse practitioner is saying, boy, the work has really made you nervous and upset when he's not going in every day doing something. His doctor prior to that date had said, you need to be out for work for stress. You need to be out for work for your mental health condition. But then he was treated and he returned and he was fully able to return. At that date, he was fine. He wasn't seeing, it wasn't ongoing treatment as of August 4. At that date, he was able to return saying, I'm here, ready, willing, able to work. He didn't have to go back and return to the doctor until the way the employer responded to his return to work. It was then that he experienced conditions and ended up, I think it was a physical condition, and ended up in the hospital, at which time he was again pressured to this meeting with his SSA to say, hey, you must meet with me now, you must meet with me now, which again continued to upset and aggravate him. There is not a note from the doctor, so to speak, between the August 4th, 5th return date and the August 14th incident, which we allege was the retaliatory act by the government. Okay, so was he sitting at home every day from August 5th to 14th upset about what happened on that day? No. Also during that time period when he returned to work, he wanted to have his, he was still awaiting an answer, I believe, on the supervisor on who his SSA was going to be at that time. One of his earlier accommodation requests was that he have a change in the SSA. That request was not made, and that request was also not made during that time. When he was, he literally went from, and again, it's not my, I'm not a doctor. I can't decide why David Karcher, why, what upon the return or why it affected him so, but it did. It's a reason why David says it did. They have nothing to contradict that it did not. So his emotional state, I'm not here to judge it. I'm not here to say, hey, the way he was treated should not have caused the aggravation of the injury. I'm saying it did. It caused an aggravation of his emotional condition and his stress and everything as to how he was treated. This was a man who took pride in being a special agent. He felt like he did a good job. What did he want for his accommodation? What was he requesting? Mental, physical? For the accommodations, if we're referring, and again, it's, I think, a timeframe-based thing. After the August 4th. Accommodation after the August 4th was I need to be able to be permitted to continue to work, particularly if my employer is wanting me to address issues of HIPAA releases and notes. So he asked for, to be able to maintain his computer. He asked to be able to keep his CAT card and none of those accommodations were made. This employer did not say- What kind of work was he going to do on the computer? I mean, he didn't want to do the work that he had done before because it was upsetting to him, okay? So what's the accommodation he's asking for if he has the computer? He was asking for the ability to communicate. He was asking for the ability to keep his computer, to keep his CAT card, to be able to maintain communications with the government rather than simply just from a personal phone. He needed to be able to perform various- What was he actually working in, right? Because he hadn't had the fitness exam yet and they weren't letting him back to work. So the accommodation wasn't a work accommodation. It was an accommodation to help him negotiate coming back, but it wasn't actually like I'm in my office trying to prepare for oral arguments and they come and take my computer away. And so I'm reading these briefs, which I can actually do, but takes my computer away. Well, then it's harder for me to do my job if the IT people came and grabbed my computer and sat me down in a room without it, okay? But if I'm on vacation for a week and I say I don't want to be bothered, then I don't need my computer for that week. So here he's home, right? Or he's not at work. He told me that. I asked that at length. So the computer accommodation was instructed as a work accommodation. There were other work-type tasks. He was being paid, he was employed, and there were other work-type tasks he was asked during that time frame to perform. What was he doing? While he wasn't working in the sense of investigating an active, ongoing case as an SSA, there were work tasks he was asked to perform. One of those work tasks included, I can't remember what it was, it was either weapons or guns or something that he had loaned out to someone else. I can't recall exactly from the record or brief, but he had, there was a document on his computer. And it was on the government's computer. It wasn't something he had. You can't, as a government employee, take these documents and these things home. And the only way to respond to the employer's request during that time frame for the return of this stuff, which he no longer had, and to prove he no longer had it, was on that computer. So the employer can't say to him, hey, I need you to do this employment activity, whether it's a simple matter of responding to a request from a supervisor as to location of evidence or location of guns, without that computer. He can't respond, communicate, and that was the issue beyond the August date. Let me back up. There were. To the issue of his anxiety. And again, I totally agree with you. We are not here to appeal. And I respect his anxiety and all of that. So that isn't the issue. But if we had somebody who was a football player who said, my disability is I cannot touch footballs, I think we would all agree that they probably couldn't keep him as a football player, however much they respected that disability. So here, he's an agent in very complex and difficult issues. And so, if people being kind of nasty to him is something he cannot handle, how can he serve as an agent at all? Again, I'm not being disrespectful to him, but I'm asking a question because he does have to be capable with the accommodation of performing the duties. We don't know that in this case, because we're asking about hypotheticals and speculation into the future. What happened in this case is that when he was treated in such a manner, it so aggravated that mental condition that we admit he was therefore, and it ultimately led to his termination, or I would say his separation from employment, because the termination is not an issue. We do not contend that at the time of termination, he was unable to return. He was emotionally damaged by what occurred at the workplace. At that point, he was unable to return, and we didn't bring that claim. I'm sorry to interrupt you, but you keep referring to what happened at work, what happened at work. What gave rise to his disability or what exacerbated it, I guess, was the actual work itself, and I think that's what Judge Haynes and Judge Clement are asking. If a person could go out into the field and do the job, if the very job itself that he was doing caused him to get anxious, caused him to get depressed, caused him to want to lash out, I mean, I think he said these things, wanted to lash out at the victims or the people he was investigating, how could he do this job? How was he qualified to have the job? I believe Your Honor is referring to an earlier time frame. In the March-April time frame of 2014, Mr. Karcher, that's when he says, I'm stressed, I need some help with my work. Those are the accommodations that we emphasize were not made for him in early March, in early- Well, they weren't made for him then because he didn't reference a condition for his request for accommodations, did he? I mean, he didn't tell anybody about it. Well, he didn't tell anybody, hey, I have been specifically diagnosed with ADHD, hyperanxiety disorder, or whatever the disorder is, but he did say, I'm under stress. I have, he made numerous lists of his claim that I'm having trauma, I'm stressed. He said, I'm highly stressed. So we put throughout the brief the words he used. I don't believe there has to be some sort of triggering word from the employee to the employer to say, hey, here is my specific condition and here is what I need in response. But there may not have to be . . . He said enough to trigger, hey, employer, I need you as the employer, the more knowledgeable one, to help me, the employee, in assisting with my job. He went to supervisors saying, please help me. Let me get you off topic before you run out of time and if Judge Haynes will So one thing the District Court noted, and it actually relates back to this August 14th or 12th time frame, the District Court noted that the plaintiff's response to the summary judgment motion was so deficient, in other words, it did not cite authority, did not cite to the record, did not point the court to where there was an issue of fact, those kinds of things, that the summary judgment motion could have been granted on that ground alone. So if we conclude that the We don't even have to get to any of the specific claims. In other words, we can find that the District Court's summary judgment was warranted based on the plaintiff's deficiencies in terms of the record and the authority. Do we even get to these claims? And specific to the August 14th, I guess, alleged lack of accommodation, was that argued before the District Court and raised specifically? Yes, I believe that argument was raised. I think there was a lot of confusion and quite frankly, there still is confusion in . . . can I finish? Go ahead. And I believe there still is confusion with respect to Mr. Karcher's claim. While we did not make specific citations to various sections, we didn't really honestly feel we had to because the one document submitted, that one thirteen page affidavit was enough. The District Court could have just simply read that thirteen pages and determined that David Karcher had enough to go forward. The issue of the August 4th date and the return to work, there's numerous claims prior to that, the hostile work environment, the failure to accommodate, that David Karcher should have been permitted to go to a jury on. I'll save the rest of what I wanted to say. One follow-up if I may. Just going right back to the August timeframe, is it accurate or not accurate, and correct me if I'm wrong, that in the District Court, the only mentioned accommodation that Karcher raised was up to and including the August 4th request? In other words, was August 12th or 14th even mentioned in responding to summary judgment? As far as the, on the specific request of accommodation? Yes. I don't recall. Okay. I don't want to side up. Thank you. Mayor or Mayor? Mayor. Mayor.  Thank you, Mr. Attorney. I'm along with my colleague, Jessica Bourne, here today on behalf of the athlete, the Department of Navy. I'd like to start with the court was just questioning the appellant about just the August 4th return of Mr. Karcher, his attempted return without restriction, and that it was stated that that was the first time he was known to be placed on limited duty status, and that he was going to have to turn in his credentials, turn in his firearm, until he completed a fitness for duty exam. That's actually not accurate. Mr. Karcher was first notified that he was going to be placed on limited duty status and have to return his credentials until he passed a fitness for duty exam on July 14th, and the reason for that is to give some background as to when Mr. Karcher actually took leave. Mr. Karcher took leave at the end of June, and at that time, Mr. Karcher submitted to the Navy a note from his nurse practitioner that said he could not return to work as stable, and that's what he provided to the Navy and plus his own words to the Navy that he could not continue to work family and sexual violence cases. It is then on July 14th that Mr. Karcher received a letter from Special Agent in Charge Mr. Tim Reeves who advised him just until the Navy can get a handle on his medical condition that he was going to be placed on limited duty status, he was not going to be able to carry out aggressive law and when the nurse practitioner cleared him, he was still going to have to be cleared by the Federal Occupational Health, and specifically that letter is at page 318 in the record. Four days later, after receipt of that letter, Mr. Karcher submits another letter to the Navy, this one a second note from his nurse practitioner, and that note from his nurse practitioner at page 320 in the record provides he had complaints of severe anxiety secondary to pressures at work and that the secondary symptoms of anxiety make it very difficult for David Karcher to carry out his duties at work. So he has submitted two documents or two medical notes from his nurse practitioner saying he cannot carry out the functions of a criminal investigator at the Navy. He's also said the same in his own violence with the Navy and in his own words to the Navy as he's communicated to this. But then, two weeks after submitting this note from his nurse practitioner, he gets a third note that says he wants to come back without restrictions. The Navy, as it had previously told him, that he can come back, but he's going to have to pass a fitness for duty exam from the Federal Occupational Health, which he had already known about since the middle of July. So that could have been... What about his argument that he did agree to the fitness exam, but he just didn't agree to producing every medical record of his whole life? Well, Your Honor, the Navy has a standard medical release form for these fitness for duty exams. Fitness for duty exams involve an independent medical exam, which requires a review of applicants or, in this case, agents seeking to return medical records. It's an independent psychological exam and an independent psychiatric exam. What Mr. Carter attempted to do was craft his own medical release that would narrow the availability of what records the Navy could review in order to determine whether he was fit to carry out aggressive law enforcement duty. They couldn't do that. They have to actually look and make sure that an agent is actually capable of doing that. And what is your response to my question about the... So if he was treated nastily on August 4th and that highly exacerbated his problems, does that mean he's not qualified to be an agent? I mean, is it a job that involves a fair amount of interaction with difficulty? Let's just put it that way. It does, as all law enforcement work does, Your Honor. We cited to a case from the Seventh Circuit, the Kertzhaus case, 969 F3rd 725, which had a very concise but at the same time comprehensive description of why it's important that you're going to be a law enforcement officer. It means you're going to have the ability to carry a gun. You're going to have a badge. You're going to interact with the public. You have the power to arrest. You have the power to interrogate. And the power to detain. I mean, for public safety, you have to ensure that this individual is capable of carrying out those duties. Archer had twice provided medical notes saying he couldn't and had told the Navy he couldn't and then just wanted to come back without restriction. The Navy had a duty to complete a fitness for duty exam at that point. Was there a concern that his anxiety and being upset by somebody being nasty, let's just put it that way, might cause him to shoot someone that he shouldn't have shot or react in a way that would create kind of some of the issues we've seen over the last few years? Your Honor, precisely. Any number of potential dangerous hypotheticals could stem from allowing somebody who is not mentally stable and who has said he is not stable. His nurse practitioner said he is unstable. Any number of very dangerous and potentially deadly consequences could float from that if the Navy doesn't ensure that its agents are capable of carrying out those functions. But why not try to find him, I know that later on after he failed the exam, you all tried to give him some accommodations but he wasn't interested, I mean accommodations in terms of a different job. Why not do that at that time? If you feel like he's just not going to be able to handle this kind of job anymore, why not make the effort to find something else that is more in keeping with his situation? There was. On August 4th? Yes, Your Honor. When he was placed on limited duty status and was told he needed to turn in his firearm and his badges, there was the opportunity for him to carry out limited or routine tasks. In fact, the special agent in charge had told him she was trying to get him special credentials so he could still get onto the base and do what he needed to do, he just can't carry his law enforcement credentials. She told him in an email to page 322 in the record, sort of outlining certain tasks that he can't do, but also what he could do, for instance, drive government vehicles on routine tasks around the base, and if he needed to go off base for a routine task that didn't involve law enforcement activity, as long as he got permission, he was going to be allowed to do that. So the Navy was not saying just don't come. In fact, the Navy was actively trying to give him special credentials so he could come, but he chose not to do that. Didn't they refuse to let him keep his computer? The computer, he actually did wind up keeping his computer. He declined to want to turn the computer in. This is the August 15th meeting, and there were two issues. He had a call from his special agent in charge saying you need to come meet with us, you still have government equipment, because it is a government-issued computer, and you need to turn in your computer. What ultimately happened is he kept the computer, but he had lost access to some software that was web-based software that he couldn't access, some timekeeping kind of software, but he was still able to communicate with anybody at the Navy he needed to communicate with. I'm not sure it was accurately communicated that he needed that as some kind of a special accommodation. I think he just didn't want to come in. Well, the record doesn't reflect that, but he didn't want to come in. Well, having a computer doesn't make you less anxious, I don't think. It does not seem directly related to that. Computers can be important for a lot of things, but... Correct, Your Honor. And by that time, the August 15th, he had already gotten the next doctor letter that said, now you're kind of back in a very difficult place. Correct. He had submitted yet another note saying he was unable to return to work, he needed to have additional treatment or medical treatment, and it was also at the time that there was back and forth about the consent for fitness for duty, which he ultimately did consent, filed and had his fitness for duty exam, which is in the record, and he was found unfit for aggressive law enforcement activity. And at that point, they offered to meet with him about trying to find another job, and he didn't. That's absolutely correct, Your Honor. He wanted nothing more to do with the Navy, right? Correct. They provided him the formal interactive process that the Navy provides, and he declined. In fact, they checked the box saying he declined to do that. But what if counsel's argument that the way he was treated when he tried to return to work in early August led to the exacerbation of these symptoms, that he basically had to quit, he had no choice, he couldn't do the job. I mean, flesh out a little bit your response to the hostile work environment claim, the retaliation claim. I mean, is counsel right about that, that we can separate one of that pre-August to post? No, Your Honor, the record just doesn't bear that out. He was not treated any differently when he attempted to return on August 4th than what he already knew on July 14th, that he was going to have to commit or complete a fitness for duty exam. He was going to have to return his firearm. He was going to have to return his credential. So these were things he knew on August 4th. And in fact, in the record, it shows when he attempted to come back, his special agent in charge, and this is again to page 322, her letter to him or emailed him, we want you to come back. We just need you to complete your fitness for duty exam, and I support the decision to do that, but we're going to work with you to try to bring you back. So the record doesn't bear out that he was treated in some hostile manner after he tried to return on August 4th without restrictions. It just bears out that the Navy was carrying out its duty to make sure he was fit to perform law enforcement activities. But if he says differently, is that a material issue of fact? No, Your Honor, because it just doesn't rise to – it's a conclusory assertion by Mr. Karcher that's just not borne out in the record. In fact, it's unsupported in the record as to what happened on August 4th. And again, that one-off phone call or one-off meeting on August 15th, that in and of itself doesn't make the severe and pervasive conduct to establish a hostile work environment claim. It requires much more than that, and we cite it to some cases in our briefing along with Hernandez case in particular that cites an unfair treatment, a nasty work meeting, a mean phone call from your supervisor. All of these things taken together don't amount to a hostile work environment. With my additional time, I would like to turn to the – well, this is important too, and I'll conclude with this – is the retaliation claim, because I think it was stated in an opening argument that August 4th was the retaliatory act by the Navy requiring to do the fitness for duty and limited duty, being placed on limited duty status. Well, the district court correctly disposed of that claim if that's the conduct alleged of, because that happened prior to Mr. Karcher ever engaging in any protected activity, which wasn't until August 5th. You can't retaliate against somebody for protected activity that hasn't occurred yet. And so that's what the basis for the district court's finding that Mr. Karcher's claim for retaliation just chronologically doesn't make sense. Now, in briefing to this court, that has evolved, as some of the claims have. They've evolved as to when the alleged retaliatory conduct is. And in this case, Mr. Karcher in his reply brief says that, well, actually the alleged retaliatory conduct I'm complaining about is the August 15th meeting, which is when they asked for my computer back and had a supervisor call me and tell me to come back. Well, again, one-off phone call from the supervisor asking for government property in return, as the Hernandez case held, in terms of requiring the return of a government vehicle, that's not a materially adverse employment action to support a retaliation context. So even if Mr. Karcher shifts what he's claiming to be the alleged retaliatory conduct, it still fails because it fails to meet the prima facie case of a retaliation claim. Well, counsel, you say it evolved, but is the claim just waived? In other words, if you've got one basis for alleged retaliation that was argued before the district court but is not argued here, you've got another basis for retaliation argued here but not raised before the district court, it strikes me that we have waiver on both sides, do we? You're on the—precisely. And that's exactly what the Forsyth case addresses. It's the idea that you can't just dump a bunch of material into the record and just sort of pick and choose as you make your way along. In fact, I think the language in Forsyth is you have to cite your evidence in a precise manner as to why it supports your claim. So what about the argument that it's not that much to ask a district judge to read the affidavit? Well, it was more than that. It was not just the 13-page declaration. It was about a 200-plus-page deposition transcript and then a third declaration from Mr. Karcher's spouse that were all attached as exhibits to the motion for summary judgment but then not cited to in the argument section of the district—the briefing to the court. So how is the court to know where it should focus, what it should pull out? In fact, that's exactly what Forsyth said you don't—the court shouldn't have to do. There's no duty on a district court to help a litigant make its case. And if you don't cite to anything in the record, you just put it in the record, then that is insufficient for summary judgment purposes. What's the Navy's position on the question I'd asked counsel opposite earlier about the district court's finding statement that the response to summary judgment in itself justified granting the motion? In other words, the response was wholly inadequate. And the court went on to address each claim, but specifically what does the Navy think about that and are there other claims we should look at as you contend are either waived or forfeited? Your Honor, I think all of the claims were deficiently briefed as the district court held and that's exactly what this court did in Forsyth. It said that all of these claims were not sufficiently briefed and could be dismissed for that reason alone but then actually did the extra step and I think the district court did a very thorough analysis of each of the claims as best it could based on the briefing but was correct in finding that if the litigant has not sufficiently briefed the issues on summary judgment, that in and of itself is reason to grant summary judgment in favor of the litigant. I'm with you. Okay. Thank you very much. Thank you. We'll hear from Ms. Johnson-Aboe. Please, the court. On the retaliation claim, I think the emphasis was put in correctly as far as retaliation. At the time we were talking about August 4th as far as the hostile environment. On August 14th is the retaliation. It's when David Karcher was threatened with criminal charges. To say that an employer telling an employee that, hey, we can bring criminal charges against you is not hostile or is not retaliatory, that is incorrect. Also, taking the fitness for duty exam in and of itself, we allege, was retaliatory in the way it was presented to Mr. Karcher. I want to distinguish the Freelane case cited in the supplemental brief. It's one of the things that I had intended to do. The Freelane case is distinguishable from this case because in that case, they referred to the police officer Freelane's return to work and they were saying why the fitness for duty test was permissible in that case and could have been done. Well, in that case, Freelane was on intermittent leave, intermittent FMLA. So his return to work, the specific return to work said he's currently receiving counseling for stress. That's distinguishable from this case and I think that's one of the issues and the problems with mental health conditions and mental health issues which is why, quite frankly, for policy reasons in this country, we should not treat people with mental health and mental disabilities different than those with physical disabilities. When a doctor says, whether it's a doctor or a nurse practitioner, when a medical provider says, this person is able to return to work with no restrictions, what evidence or what did the government have at that point to say that that note was inaccurate, that that note was factually incorrect? Instead, he was immediately treated as if that note was not accurate. The counsel, he'd had a note two weeks before, which is not that long ago in world history, saying he wasn't fit for duty and the Navy also was aware of his own statements saying, I feel like I'm going to lash out. I feel like they're all lying. I feel like these cases, I mean, we have, there's a record here before that note which kind of appears to be an anomaly, not necessarily something in isolation. With all due respect, that's a little prejudicial against those with mental health disabilities to say that they cannot recover or be cured within any period of time. I hit myself on Friday and I had a bruise and you don't see it as much on my arm today, only days later. Who's to say that I wasn't two days ago crying over the future death of my mother and yet today I'm able to perform in court? So someone can recover from their mental condition within a short time. ...concerned about people carrying Navy guns and dealing in law enforcement. As we know, you want to be very careful in making sure that law enforcement doesn't arbitrarily or unnecessarily or on a moment's notice put someone else at risk. And so I don't know that it is inherently disrespectful to make sure that somebody who's been on leave can now return and pick up a gun and do all of the things that someone in his position would be doing. We're also talking about the same Navy that in March and April of 2014 when David Karcher himself came to the employer and said, please help me with my stress, please help me with what's going on, we said to him, no, we're not helping you, we're not going to postpone your FNSV class, the sexual assault class, you just keep working. So how can the Navy on the one hand, before all of this, say to him, oh no, you're able to work, you're able to work, you're able to work, and then when he comes forward with, I am able to work, they say, oh no, now you're not able to work. So this is the same Navy that responded completely differently in March and April of 2014. But counsel, the completely different response might have been, might it not, because of the fact that in March and April, Mr. Karcher didn't cite a disability. He didn't inform the Navy of his disability in terms of a condition that required accommodation. By the time we get later into the summer, he had. Isn't that a difference? And while he didn't specifically bring a medical note prescribing a particular mental health condition, it doesn't mean that he himself didn't reference his own mental health condition. And I don't think that in order to... So where does he say that he did? I mean, other than stress, because, I mean, the problem that I'm seeing here is, you know, we've all worked in law firms where we're stressed out and not always treated best, and then, you know, that sort of complaining about that or saying, I wish that they would, like, let me sleep is not necessarily the same thing as saying, I have a mental disability as a result of or in connection with this work at this law firm. Do you see that? So point me where he makes that clear distinction between just life is stressful, I'm being overworked, I'm tired of this, which a lot of people have, and I have an actual mental disability. He never uses the term mental disability, but I believe in the record on page 467 in his affidavit, he specifically discusses how he's overwhelmed, he says he's stressed, he says he suffers from great stress, he said he had physical problems, and he specifically discussed memory problems. Did he tell the Navy? Where's the proof that he told the Navy that he had a disability in March, April? The proof is his own testimony. His affidavit that says, I met with my supervisor and told her these things. He said he was stressed. There again, I realize again, I'm not being disrespectful. I respect very much his situation. It's just that I would guess that most people that have worked in an at-all-difficult job have suffered some degree of stress. I do not think that means all of them have a mental disability. Whether they have an actual disability, I don't think the law required him at that point to have an actual disability if the Navy perceived him to have a disability at that point. But I think to Judge Haynes' point, how could they have perceived him to have a disability based on his stress? The Navy was the one requesting and telling Mr. Karcher, as far as perceiving him to have a disability, when he returns with no disability, that says, OK, no, we think you're still disabled. You have to do this. You fast-forwarded to August. I'm asking about March, April, May of the same year. In March, April, and May, he specifically requested numerous accommodations, and none of those accommodations were made for Mr. Karcher. He requested accommodations due to his condition, and he expressed that to his supervisor. He did not use the triggering words disability, mental disability, or give some medical diagnosis. He did not present a doctor note. We admit to that. But he did say enough to trigger the employer to have to make accommodations. OK. And so we really appreciate your argument. We've all read the affidavit. We'll read it again, and we really appreciate your argument and your argument as well. And the case is under submission, and we are concluded for today, and we will resume oral argument tomorrow morning at 9 a.m. Thank you.